WILLIAM V. PERNIK (SBN 245394)
william@perniklaw.com
NAS YASIN (SBN 337738)
nas@perniklaw.com
PERNIK LAW APC
40 Central Avenue, Suite 4
Salinas, California 93901
1600 Alameda Ste 202
San Jose, California 95126
Telephone: (833) 733-6451
Facsimile: (831) 515-3657

Attorneys for Defendant
ABDULRAHMAN ALFOZAN

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ABDULRAHMAN ALFOZAN,<br><br>Defendant. | **Case No. 3:26-mj-71329**<br><br>**DEFENDANT ABDULRAHMAN ALFOZAN'S NOTICE OF MOTION AND MOTION FOR PRETRIAL RELEASE ON CONDITIONS AND OPPOSITION TO GOVERNMENT'S MOTION FOR DETENTION; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBITS A–M**<br><br>Date: October 19, 2026<br>Time: 11:00 a.m.<br>Court: Hon. Alex G. Tse, U.S. Magistrate Judge<br>Ctrm.: 15A |

**NOTICE OF MOTION AND MOTION**

TO THE UNITED STATES ATTORNEY FOR THE NORTHERN DISTRICT OF CALIFORNIA AND THE ASSISTANT UNITED STATES ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 19, 2026, at 11:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Alex G. Tse, United States Magistrate Judge,

at 450 Golden Gate Avenue, San Francisco, California, Defendant Abdulrahman Alfozan will, and hereby does, move for an order releasing him pending trial on conditions under 18 U.S.C. § 3142(c), and opposes the government's motion for detention.

The motion is based on this notice; the memorandum of points and authorities below; Exhibits A through M filed herewith (with Exhibits G and M lodged conditionally under seal), including letters from fifty-four people, many of whom have known Mr. Alfozan for more than a decade; the Pretrial Services Report; the files and records of this case; and any evidence, proffer, and argument presented at the hearing. *See* 18 U.S.C. § 3142(f) (defendant may "present information by proffer or otherwise").

Mr. Alfozan asks to be released on the following conditions, together with any others the Court finds necessary: (1) supervision by Pretrial Services; (2) location monitoring by GPS ankle monitor, with home detention at his family's Millbrae residence; (3) surrender of all passports and travel documents and a bar on obtaining new ones; (4) an appearance bond co-signed by sureties from his Bay Area community and supported by the written undertaking of the Consulate General of the Kingdom of Saudi Arabia; (5) no international travel of any kind, and no travel outside the Northern District of California without prior Court approval; and (6) the financial, no-contact, and other conditions set out in Part IV.D below.

Dated: October 16, 2026

Respectfully submitted,

PERNIK LAW APC

/s/ William V. Pernik

/s/ Nas Yasin
WILLIAM V. PERNIK
NAS YASIN
Attorneys for Defendant
ABDULRAHMAN ALFOZAN

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION.......................................................................................6

II. STATEMENT OF FACTS.......................................................................8

A. Fifteen Years in the United States........................................................8

B. His Family and His Community............................................................9

C. The Charge..........................................................................................10

D. The October 12 Trip...........................................................................11

E. The Consulate's Written Undertaking..................................................13

III. LEGAL STANDARD...............................................................................13

IV. ARGUMENT.............................................................................................15

A. No Presumption Applies, and the Government Must Prove a Serious Risk of Flight.................15

B. The Section 3142(g) Factors Favor Release..........................................15

1. The nature and circumstances of the offense..........................15

2. The weight of the evidence.....................................................16

3. Mr. Alfozan's history and characteristics...............................16

4. Release poses no danger to any person or the community..................17

C. The Government's Flight-Risk Theory Does Not Withstand Scrutiny...........18

1. Saudi nationality is not evidence of flight...............................18

2. The one-way ticket was bought before any investigation existed, for a date set by immigration rules..........19

3. One-way booking is Mr. Alfozan's long-standing habit, and his travel record shows he always returns..........20

4. Financial means are a factor that conditions can address, not a basis for detention..........20

5. Mr. Alfozan has every reason to stay and defend this case.................20

D. A Rigorous Combination of Conditions Will Reasonably Assure His Appearance........21
E. Detention Would Impose Serious and Unnecessary Harm........23
V. CONCLUSION........24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Ailon-Ailon*, 875 F.3d 1334 (10th Cir. 2017)........18
*United States v. Aitken*, 898 F.2d 104 (9th Cir. 1990)........14
*United States v. Byrd*, 969 F.2d 106 (5th Cir. 1992)........15
*United States v. Fortna*, 769 F.2d 243 (5th Cir. 1985)........14, 23
*United States v. Gebro*, 948 F.2d 1118 (9th Cir. 1991)........13, 20
*United States v. Himler*, 797 F.2d 156 (3d Cir. 1986)........15
*United States v. Hir*, 517 F.3d 1081 (9th Cir. 2008)........14
*United States v. Holloway*, 781 F.2d 124 (11th Cir. 1986)........14
*United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985)........13, 14, 16
*United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021)........18, 20
*United States v. Orta*, 760 F.2d 887 (8th Cir. 1985) (en banc)........14
*United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988)........15
*United States v. Salerno*, 481 U.S. 739 (1987)........13, 14, 15, 18
*United States v. Santos-Flores*, 794 F.3d 1088 (9th Cir. 2015)........13, 18
*United States v. Scott*, 450 F.3d 863 (9th Cir. 2006)........14
*United States v. Singleton*, 182 F.3d 7 (D.C. Cir. 1999)........15
*United States v. Soriano Nunez*, 928 F.3d 240 (3d Cir. 2019)........18
*United States v. Stone*, 608 F.3d 939 (6th Cir. 2010)........14
*United States v. Twine*, 344 F.3d 987 (9th Cir. 2003) (per curiam)........15
*United States v. Winsor*, 785 F.2d 755 (9th Cir. 1986)........20

**Statutes and Regulations**

18 U.S.C. § 2511(1)(b)........................................................................................6, 10, 15

18 U.S.C. § 3142.............................................................................................................*passim*

8 C.F.R. § 214.2(f)(5)(i)........................................................................................12, 19

**Other Authorities**

Fed. Judicial Ctr., *Benchbook for United States District Courts* (7th ed. 2026)…14, 15, 18, 23

S. Rep. No. 98-225 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182........................................13

Jefri Wood, Fed. Judicial Ctr., *The Bail Reform Act of 1984* (4th ed. 2022)..........................23

*FBI Arrests OpenAI Employee Accused of Planting Hidden Recording Device in Conference Room*, TechCrunch (Oct. 13, 2026)..............................................................8, 11

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Abdulrahman Alfozan came to the United States in 2011 as a college freshman at the Massachusetts Institute of Technology. Fifteen years later, his entire adult life is here. He has lived in the Bay Area for about a decade. He spent nearly six years as a software engineer at Facebook (now Meta), worked as an engineer at Nash Technologies, a San Francisco startup, earned a master's degree from UC Berkeley, and joined OpenAI in 2025. He has been a lawful permanent resident since 2020. His application for United States citizenship is pending, and USCIS has scheduled his naturalization interview in San Francisco for November 6, 2026, an appointment that came to be after he submitted his citizenship application and went through the process required. He married in 2023, and he and his wife welcomed their first child, a United States citizen, earlier this year.

The government asks the Court to jail him until trial on a single count under 18 U.S.C. § 2511(1)(b), a non-violent offense with a five-year statutory maximum. No presumption of detention applies. The government's case for detention rests on three facts: Mr. Alfozan is a Saudi national, he has financial means, and he held a one-way ticket to Saudi Arabia. None of them, alone or together, carries the government's burden of proving that *no* condition or combination of conditions can reasonably assure his appearance.

<u>Nationality is not evidence of flight</u>. The Bail Reform Act entitles noncitizens to the same individualized assessment as citizens, and Mr. Alfozan is not a visitor; he is a permanent resident on the verge of citizenship. There is concrete evidence, including official letters from USCIS, indicating that Mr. Alfozan is weeks away from his citizenship interview. Financial means describe many defendants this Court releases every day, and the conditions proposed here address and neutralize these concerns effectively. And the ticket, examined closely, undercuts the government's theory. Mr. Alfozan bought it on September 13, 2026, seventeen days before OpenAI found the device at issue and twenty-six days before his arrest, when there was no investigation to flee. The family planned the trip for family and immigration reasons and booked it before the device at the center of the complaint was allegedly placed. Further,

Mr. Alfozan was made aware of OpenAI finding the device per its own filings and OpenAI's public statements, approximately eight to ten days before he was arrested. If his intention was to flee, he would have done so at that time. The October 12 departure date was fixed by federal immigration rules: it is the last day of the sixty-day grace period his wife was permitted to remain in the United States after her post-completion work authorization ended. And buying a one-way ticket, then booking the return later, is how Mr. Alfozan has traveled for years. He has always worked in tech, where he is constantly pulled into last-minute meetings, projects, and other obligations. As a result, he has learned to purchase one-way tickets, because doing so is more cost-effective than changing his flights at the last minute and because he often has to return sooner than expected. His sworn naturalization application lists twenty-five international trips between 2020 and 2025, twenty of which included Saudi Arabia. He came back from every one, and there is no reason to believe this trip would have been different. Further, the Government has provided no evidence to suggest that Mr. Alfozan made any attempts to move his flight to an earlier date once he suspected he was being investigated. Most tellingly, ***seventy percent of the airline bookings in his email since January 2021 (96 of 138) were one-way tickets.*** (Ex. L.)

But Mr. Alfozan does not ask the Court to rely on his word alone. He proposes conditions that go above and beyond what is needed to assure his appearance at all future proceedings: GPS location monitoring and home detention; surrender of every passport and travel document, with no new ones issued; no international travel of any kind and no travel outside the Northern District of California; a bond co-signed by members of his Bay Area community and backed by the written undertaking of the Consulate General of the Kingdom of Saudi Arabia; and supervision by Pretrial Services. Fifty-four people (among them a physician, engineers, startup founders, former housemates, and friends of more than a decade) have written to the Court on his behalf. The Act requires conditions that *reasonably assure* appearance, not a guarantee. But here, these conditions do far more than that. As the Government is also aware, the media is heavily focused on this case; Mr. Alfozan's face is quite literally everywhere. Paired with the facts above, fleeing is not an option for him. His best

chance to have any return to normalcy in his life is to appear in court, address the allegations against him, and handle his case appropriately. Numerous members of his community have stepped up to offer their word—and their finances if necessary—to support Mr. Alfozan's release. His country of origin, Saudi Arabia, responded to a request for consular assistance, and its Consulate General has confirmed in writing that it will not issue him any travel document while he is on release. (Exs. J, K.)

Accordingly, this Court should deny the government's motion and order Mr. Alfozan released with reasonable conditions of supervision to ensure appearance in court and public safety.

## II. STATEMENT OF FACTS

### A. Fifteen Years in the United States

Mr. Alfozan, now 35, arrived in the United States in 2011 to begin his undergraduate studies at MIT. (Ex. A (letters of Abubakar Abid and Erik Johnson).) After MIT he moved to the Bay Area to build a career in technology. (*Id.* (letters of Abid and Ali Abdalla).) He worked as a software engineer at Facebook, Inc. (now Meta Platforms) from 2017 to 2023, and as an engineer at Nash Technologies, a San Francisco startup, from 2021 until he joined OpenAI in 2025. (Ex. D (Form N-400).) While working, he completed a Master of Information and Data Science at UC Berkeley in May 2025. (*Id.*) In July 2025 he joined OpenAI as an engineer on its product team. OpenAI has publicly stated that it terminated his employment on October 9, 2026, the day of his arrest. *See FBI Arrests OpenAI Employee Accused of Planting Hidden Recording Device in Conference Room*, TechCrunch (Oct. 13, 2026) (reporting OpenAI statements). However, before his arrest, Mr. Alfozan was informed that he had been placed on administrative leave; his paternity leave was scheduled to begin on October 19, 2026. (*See* Ex. H (leave dates).)

He has lived in the Bay Area continuously: in Mountain View from 2017 to 2023, in Palo Alto from 2023, and now in Millbrae. (Exs. D, F.) He has been a lawful permanent resident since September 14, 2020. (Ex. D.) On July 10, 2025, he applied to become a United States citizen. (Ex. E (USCIS Form I-797 receipt notice).) On October 1, 2026, USCIS

scheduled his naturalization interview for November 6, 2026, at its San Francisco Field Office. (Ex. F.) This was a long-held dream for the Alfozan family, as it is for so many immigrants.

**B. His Family and His Community**

Mr. Alfozan married his wife, Lujain Alassaf, in 2023; his MIT classmate Erik Johnson gave a speech at the wedding. (Ex. A (Johnson letter).) Their son, N.A., was born this year in the Bay Area and is a United States citizen by birth. Friends describe the baby shower that Mr. Alfozan and his friends hosted at the couple's home, and the care with which he prepared for fatherhood. (Ex. A (letters of Abid and Abdalla).)

The community that stands behind him is unusual in both its breadth and its duration. Fifty-four people have written to the Court: eight in letters bearing their full names (Ex. A) and forty-six more whose surnames and contact information have been redacted from the public filing to protect the writers' privacy, given the negative reporting and media coverage of this case (Ex. B). More have contacted his attorneys in hopes of writing additional letters. At least twenty-seven of the writers live in the Bay Area, and at least twenty-four have known Mr. Alfozan for a decade or more. (Exs. A, B.) They include a Stanford emergency-medicine physician, an assistant professor, ten company founders and chief executives, more than a dozen engineers and engineering managers, an engineer designing a fusion power plant, and students at Stanford, UC Berkeley, and MIT. Their accounts are specific and consistent:

- **Abubakar Abid** (MIT dormmate and former housemate; 15 years): "Over the past decade, I have watched Abdulrahman build a stable, honorable, and deeply rooted life here in the Bay Area." He has been "like a caring uncle to both of my children."
- **Ihssan Tinawi** (12 years): when Mr. Tinawi moved to the Bay Area in 2019, Mr. Alfozan "offered me a place to stay at his house and offered the use of his car while I got settled," and made the same offer to friends "whom he had not known before." "I am confident Alfozan would comply with any conditions the court sets, including appearing at every hearing."

- **Ali Abdalla** (startup founder; 13 years): "He's been deeply invested in the Bay Area for the past decade . . . . This is home for him." "I trust him to keep his word."
- **Ismail Breiwish** (Tesla systems engineer; former housemate): "Abdulrahman has lived here for more than a decade, and this is his home. . . . His family, his friends, and his whole life are here."
- **Nour Eldifrawy** (startup co-founder; 14 years): "I have no doubt he will follow any condition the Court sets."
- **Mubeen Ahmad** (Tesla engineering manager; 10 years): "I am confident he will comply with every condition this Court sets and appear at every proceeding."
- **Dr. Areeba Abid** (Stanford emergency medicine): he has been "a reliable presence at our trivia nights, kids' birthdays, and weddings for almost a decade."
- **Erik Johnson** (Commonwealth Fusion Systems; 15 years), who canceled personal commitments and is missing an important professional day to attend the hearing: "I trust that he will abide by the conditions that the court sets."

The forty-six additional writers, who include former Meta and Nash colleagues, former housemates, a neighbor, and young families he welcomed to the area, say the same. One calls him "the glue that holds the community together." (Ex. B-32.) Most of the writers state that they are confident he will follow the Court's conditions and appear as required. (*See* Exs. A, B.)

**C. The Charge**

The complaint charges one count of using or attempting to use a device to intercept oral communications, in violation of 18 U.S.C. § 2511(1)(b). The government alleges that in late September 2026 Mr. Alfozan placed a small recording device behind a television in a conference room at OpenAI's San Francisco offices, and that OpenAI found it on September 30. The offense carries a five-year statutory maximum. The complaint does not charge theft of trade secrets, economic espionage, or acting as an agent of any foreign government. OpenAI

has publicly stated that it has "no indications of this individual inappropriately accessing or exfiltrating model weights." *FBI Arrests OpenAI Employee*, *supra*.

Mr. Alfozan is presumed innocent and concedes none of the government's allegations.

**D. The October 12 Trip**

The government's oral detention motion, made in court, may rely on assertions the government made in its October 8 motion to seal: that, according to a Turkish Airlines itinerary, air tickets were purchased for Mr. Alfozan, his wife, and their infant son from San Francisco to Riyadh, by way of Istanbul, departing October 12, 2026. The government requested secrecy at the time of the sealing, arguing that Mr. Alfozan would have the means and the incentive to flee sooner if he learned of the investigation before his arrest.

These surface-level assertions may appear sensible at first glance. On closer review, however, the ticket and a few key, easily ascertainable facts tell a different story:

- **It was bought before anyone suspected anything.** Mr. Alfozan purchased the ticket on the evening of September 13, 2026, Pacific time (recorded by the airline as September 14 in Istanbul). (Ex. C.) That was fifteen days before the device was allegedly placed, seventeen days before OpenAI found it, and twenty-six days before his arrest. He booked it openly, in his own name, under his own frequent-flyer account, with his own email address and telephone number. (*Id.*) He booked it one-way, as he books most of his travel. (Ex. L.) The trip was planned for family and immigration reasons; it had nothing to do with the conduct the government alleges took place after the tickets were booked.
- **It was a modest, changeable fare.** The economy itinerary cost $1,897.59 for all three family members and could be changed for a $180 fee. (Ex. C.)
- **Its date was set by immigration rules, not by this case.** Ms. Alassaf's post-completion practical-training work authorization ran from August 14, 2025 through August 13, 2026. (Ex. G.) An F-1 student who completes authorized practical training is allowed sixty days to prepare for departure.

8 C.F.R. § 214.2(f)(5)(i). Sixty days after August 13, 2026 is October 12, 2026, the exact date of the flight.

- **His paternity leave carried a fixed return-to-work date.** Mr. Alfozan submitted a properly noticed leave request through his employer's system. The leave administrator's notice reflects that Mr. Alfozan's paternity leave was scheduled to end on December 20, 2026, with a return to work on December 21, 2026. (Ex. H.)

More importantly, Mr. Alfozan kept making commitments in the United States. On September 26, he registered to attend CES 2027 in Las Vegas on January 6 through 9, 2027, alongside friends. (Ex. I.) His naturalization interview, the final step toward the citizenship he applied for in 2025, is set for November 6. (Ex. F.) Before his arrest, he was arranging a return flight so that he could attend that interview. (Ex. M.) His plan was always to return to the Bay Area, where his home, his career, and his community are. The evidence shows that Mr. Alfozan planned to accompany his wife and son to Saudi Arabia for his paternity leave and then return. (Exs. H, M.)

Indeed, counsel has reviewed Mr. Alfozan's available travel records in the short time before this hearing. Not surprisingly, buying one-way tickets is not new for Mr. Alfozan. The defense proffers that he has routinely bought one-way tickets for years and booked his return travel separately, often after he had already departed. Of the 138 airline bookings in his email from January 2021 through October 2026, 96 (70 percent) were one-way tickets. (Ex. L.)

What matters even more is what Mr. Alfozan did at the end of those trips: he came home. His Form N-400, submitted to the Department of Homeland Security under penalty of perjury, lists twenty-five trips outside the United States between February 2020 and February 2025, twenty of which included Saudi Arabia. (Ex. D.) He returned from every one. The longest lasted thirty-one days; the average, about twelve. (*Id.*) Each departure and return can be verified in U.S. Customs and Border Protection records.

### E. The Consulate's Written Undertaking

As the Court is aware from the government's representations in court, the Consulate General of the Kingdom of Saudi Arabia has been formally notified of Mr. Alfozan's arrest. Consistent with its consular functions, the Consulate General has offered assistance to Mr. Alfozan in accordance with the applicable laws and judicial procedures of the United States. In an October 14, 2026 letter, it stated that it stands ready to cover the full amount of any bail bond the Court requires. (*See* Ex. K.) The defense also asked the Consulate General to confirm in writing that it will not issue any passport or travel document to Mr. Alfozan while this case is pending, and that it will notify Pretrial Services of any request for one. It has done so. On October 16, 2026, the Consulate General confirmed to Pretrial Services in writing that it "will not issue any travel documents" to Mr. Alfozan during his release and that, if he requests one, it "undertakes to promptly notify U.S. Pretrial Services." (Ex. J.)

## III. LEGAL STANDARD

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act "carefully limits the circumstances under which detention may be sought to the most serious of crimes," *id.* at 747, and, as to dangerousness, Congress aimed detention at "a small but identifiable group of particularly dangerous defendants." S. Rep. No. 98-225, at 7 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182. In this Circuit, "[o]nly in rare circumstances should release be denied, and doubts regarding the propriety of release are to be resolved in favor of the defendant." *United States v. Santos-Flores*, 794 F.3d 1088, 1090 (9th Cir. 2015); *see also United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir. 1985); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991) (doubts "should be resolved in the defendant's favor").

The statute begins with a presumption of release. 18 U.S.C. § 3142(a)–(c). The Court must release a defendant on personal recognizance or an unsecured bond unless that would not reasonably assure appearance and safety, § 3142(b), and even then must impose only "the least restrictive further condition, or combination of conditions," that will do so. § 3142(c)(1)(B).

The options must be considered "sequentially, in order of severity," *United States v. Holloway*, 781 F.2d 124, 125 (11th Cir. 1986), because "[t]he structure of the statute mandates every form of release be considered before detention may be imposed." *United States v. Orta*, 760 F.2d 887, 892 (8th Cir. 1985) (en banc).

The burden never shifts. The government must prove by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the defendant's appearance, *United States v. Aitken*, 898 F.2d 104, 107 (9th Cir. 1990); *Motamedi*, 767 F.2d at 1406, and by clear and convincing evidence that none will reasonably assure community safety. § 3142(f); *Salerno*, 481 U.S. at 751. "Not unlike the presumption of innocence at trial, the burden is always on the government to prove that the defendant should be detained—the defendant does not have to prove that they should be released." Fed. Judicial Ctr., *Benchbook for United States District Courts* § 1.03, at 32 (7th ed. 2026) ("*Benchbook*"). The standard is reasonable assurance, not certainty: "the standard is reasonably assure appearance, not 'guarantee' appearance." *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985) (emphasis omitted); *see United States v. Hir*, 517 F.3d 1081, 1092 n.9 (9th Cir. 2008) (the Act "contemplates only that a court be able to 'reasonably assure,' rather than guarantee," community safety); *Orta*, 760 F.2d at 891–92 (court "cannot require more than an objectively reasonable assurance of community safety and the defendant's appearance at trial").

Every decision must rest on an individualized assessment of this defendant. *Hir*, 517 F.3d at 1091 n.8 ("each case requires a fact-specific inquiry"); *United States v. Scott*, 450 F.3d 863, 874 (9th Cir. 2006); *United States v. Stone*, 608 F.3d 939, 946 (6th Cir. 2010) ("each defendant is entitled to an individualized determination of bail eligibility"). The Court weighs the factors in § 3142(g): the nature and circumstances of the offense, the weight of the evidence, the defendant's history and characteristics, and the nature and seriousness of any danger his release would pose. The weight of the evidence "is the least important of the various factors," and although the Court may consider it, "the statute neither requires nor permits a pretrial determination that the person is guilty." *Motamedi*, 767 F.2d at 1408 (citation omitted).

"Nothing in this section shall be construed as modifying or limiting the presumption of innocence." § 3142(j).

## IV. ARGUMENT

### A. No Presumption Applies, and the Government Must Prove a Serious Risk of Flight.

Detention is available only in the cases § 3142(f) identifies. *Salerno*, 481 U.S. at 747; *United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003) (per curiam); *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986); *United States v. Ploof*, 851 F.2d 7, 11 (1st Cir. 1988); *United States v. Byrd*, 969 F.2d 106, 110 (5th Cir. 1992). A violation of § 2511(1)(b) is not a crime of violence, a sex-trafficking offense, or a federal crime of terrorism; it carries no possible sentence of life or death; it is not a drug offense; and it involves no minor victim, firearm, or dangerous weapon. 18 U.S.C. § 3142(f)(1)(A)–(C), (E). Mr. Alfozan has no qualifying prior convictions. § 3142(f)(1)(D). No presumption of detention applies. § 3142(e)(2)–(3).

The government therefore may seek detention only under § 3142(f)(2)(A), which requires "a serious risk that such person will flee." That showing demands "specific evidence" of the risk this defendant presents; "[i]t is not sufficient to claim an ordinary risk that the defendant, or defendants in general who are charged with a similar offense or offenses, will flee . . . ." *Benchbook* § 1.01, at 14. Allegations of "dangerousness" or "danger to the community" do not authorize a detention hearing. *Id.*; *see Twine*, 344 F.3d at 987 (court may not order detention "based solely on a finding of dangerousness" absent a § 3142(f) circumstance); *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) ("Absent one of the[] circumstances, detention is not an option."); *Ploof*, 851 F.2d at 11. Invoking national security or working in a prestigious or sensitive tech sector does not substitute for the showing the statute requires.

### B. The Section 3142(g) Factors Favor Release.

#### 1. The nature and circumstances of the offense.

Section 3142(g)(1) directs the Court to consider "whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." None applies. The complaint

does not allege that anyone was threatened or physically harmed, and it does not charge trade-secret theft, economic espionage, or action on behalf of any foreign government. OpenAI has said it has no indication that he inappropriately accessed or exfiltrated model weights. And the government's affidavit acknowledges that no files from the device could be recovered. A single non-violent count with a five-year maximum does not create the kind of exposure that, by itself, makes flight likely.

**2. The weight of the evidence.**

This is "the least important of the various factors." *Motamedi*, 767 F.2d at 1408. The government's account rests on an untested affidavit filed before any discovery. Mr. Alfozan is presumed innocent, § 3142(j), and the Court may not make "a pretrial determination that the person is guilty." *Motamedi*, 767 F.2d at 1408. Whatever weight the Court gives this factor, it says nothing about whether conditions can reasonably assure Mr. Alfozan's appearance.

**3. Mr. Alfozan's history and characteristics.**

Section 3142(g)(3)(A) directs the Court to the defendant's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings." Nearly every one of these favors release.

*Length of residence and community ties:* Mr. Alfozan has lived in the United States for fifteen years and in the Bay Area for roughly ten. Fifty-four people, at least twenty-seven of them in the Bay Area, have written to the Court, and they describe someone who organizes dinners, welcomes newcomers, mentors students, and shows up for friends' weddings, birthdays, and moves. (Exs. A, B.) That is not the profile of a person with one foot out the door.

Moreover, Mr. Alfozan and his family made their home in the United States. Their son, N.A., was born here and is a United States citizen. Since giving birth, Mr. Alfozan's wife has struggled with postpartum depression and anxiety, for which she has sought medical care. To give her the support she needed while she remained here, Mr. Alfozan hired night doulas and a part-time nanny and coordinated with both families to bring relatives to the United States to

help after their son's birth. (Ex. M.) When her condition did not improve, and with her lawful period of stay ending on October 12, the couple decided that Ms. Alassaf and their son would travel to Saudi Arabia, where extended family could help care for them, and that Mr. Alfozan would accompany them, spend his paternity leave helping them settle, and then return home. (*Id.*) That plan was made, and written down, well before the device at issue was allegedly placed: in family messages dated August 13 and September 13, 2026, the family discussed that Mr. Alfozan would stay in Riyadh for the two months of his leave and then return to the United States. (*Id.*) The tickets were purchased on September 13. (Ex. C.) USCIS's October 1 notice scheduling his November 6 naturalization interview only confirmed the plan to return; before his arrest, he was arranging his return flight so that he could attend it. (Exs. F, M.)

*Immigration status.* Mr. Alfozan is a lawful permanent resident with a pending application for citizenship and an interview less than three weeks away. (Exs. E, F.) Few defendants have more to lose by flight. Leaving would forfeit the permanent residence he has held since 2020 and the citizenship he has worked toward for years.

*Employment and education.* He has worked continuously at leading Bay Area technology companies since 2017 and earned a graduate degree from UC Berkeley while doing so. (Ex. D.) His career, his professional reputation, and his earning capacity are tied to this region; a fugitive cannot work in Silicon Valley.

*Past conduct and record of appearance.* Mr. Alfozan has no criminal record; the only law-enforcement contacts he disclosed on his naturalization application were traffic citations. (Ex. D.) He has no history of failing to appear, and no history of substance abuse. He does not drink or smoke, as he reported to Pretrial Services. He was not on probation, parole, or pretrial release when arrested. § 3142(g)(3)(B). And his past conduct includes the single most probative fact on the question before the Court: twenty-five international trips in five years, twenty of them including Saudi Arabia, and a return from every one. (Ex. D.)

**4. Release poses no danger to any person or the community.**

Any detention based on danger requires clear and convincing evidence that the defendant "presents an identified and articulable threat to an individual or the community."

*Salerno*, 481 U.S. at 751. The government has offered none. The charge involves no violence, weapons, or threats. And "whether a defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant." *United States v. Munchel*, 991 F.3d 1273, 1283 (D.C. Cir. 2021). The conduct alleged here depended entirely on access to OpenAI's offices. That access ended when OpenAI terminated his employment. The proposed conditions (a stay-away order from OpenAI's premises, a bar on contact with potential witnesses except through counsel, a prohibition on possessing covert recording devices, and GPS monitoring) eliminate any residual concern.

**C. The Government's Flight-Risk Theory Does Not Withstand Scrutiny.**

**1. Saudi nationality is not evidence of flight.**

Apart from a temporary-detention provision not at issue here, the Bail Reform Act treats noncitizens exactly as it treats citizens. "Noncitizen defendants who are otherwise subject to pretrial release or detention under the other subsections are entitled to the same individualized assessment regarding safety and appearance as citizens." *Benchbook* § 1.01, at 11; *see Santos-Flores*, 794 F.3d at 1090 ("Congress chose not to exclude removable aliens from consideration for release or detention in criminal proceedings."); *United States v. Soriano Nunez*, 928 F.3d 240, 244–45 (3d Cir. 2019) (noncitizens "are treated the same as other pretrial criminal defendants under the BRA"); *United States v. Ailon-Ailon*, 875 F.3d 1334, 1338 (10th Cir. 2017) (decisions must be made "on a case-by-case basis").

<u>Where a person was born says nothing about whether conditions can secure his appearance</u>. That Mr. Alfozan maintains ties to his country of birth, as nearly every immigrant does, does not distinguish him from the many noncitizen defendants released on conditions. This case has received a great deal of attention from the media and the government. The Saudi government is aware of it and has been notified under the two nations' consular-relations obligations. Its Consulate General has stated in writing that it is ready to cover the full amount of any bond the Court sets, "in accordance with the applicable laws and judicial procedures of the United States of America" (Ex. K), and it has confirmed to Pretrial Services that it will not issue Mr. Alfozan any travel document while he is on release and will promptly notify Pretrial

Services if he asks for one (Ex. J). In plain terms, Mr. Alfozan has no passport in his possession, and the government that issued it has committed in writing not to issue him another travel document. The government's real concern, that a defendant who reaches Saudi Arabia may be difficult to return, applies only if he can get there. The conditions proposed below are designed to ensure he cannot: no international travel of any kind, every travel document surrendered, no new ones issued, GPS monitoring, home detention, and border authorities on notice.

**2. The one-way ticket was bought before any investigation existed, for a date set by immigration rules.**

A ticket bought before anyone suspected anything is insufficient and weak evidence of an intent to flee prosecution. Mr. Alfozan bought this one on September 13. (Ex. C.) OpenAI did not find the device until September 30. The government did not seek to seal its complaint until October 8, and did not arrest him until October 9. In seeking sealing, the government argued that Mr. Alfozan would have an incentive to flee *if he learned of the investigation*, which acknowledges that he did not know of it when he bought this ticket. The trip was planned for family and immigration reasons and booked before the device at the center of the complaint was allegedly placed; it had nothing to do with the conduct the government alleges took place after the tickets were booked.

Nor was the date chosen to evade anything. October 12 was the last day of the sixty-day period Ms. Alassaf was permitted to remain after her practical-training authorization ended on August 13. *See* 8 C.F.R. § 214.2(f)(5)(i); Ex. G. His paternity leave carried a fixed return-to-work date of December 21, 2026. (Ex. H.) The family booked a modest, changeable economy fare, openly and in their own names. (Ex. C.) And Mr. Alfozan continued to plan his life here: he registered for a January 2027 conference in Las Vegas on September 26 (Ex. I), and USCIS has scheduled the final step of his citizenship application for November 6, an interview he was arranging to return for when he was arrested (Exs. F, M).

**3. One-way booking is Mr. Alfozan's long-standing habit, and his travel record shows he always returns.**

The defense proffers that Mr. Alfozan has booked one-way international travel for years. (Ex. L.) *See* § 3142(f); *United States v. Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) (detention hearings may proceed by proffer). His own sworn travel history shows what follows those bookings. Between February 2020 and February 2025 he left the United States twenty-five times, twenty of them for trips that included Saudi Arabia, and returned every time. (Ex. D.) No trip lasted more than thirty-one days. (*Id.*) The government asks the Court to assume the twenty-sixth trip would have been different. The record offers no basis for that assumption, and the Court must resolve doubts in Mr. Alfozan's favor. *Gebro*, 948 F.2d at 1121.

**4. Financial means are a factor that conditions can address, not a basis for detention.**

"[F]inancial resources" are one of many § 3142(g)(3)(A) factors. They describe a large share of the professionals this Court releases on conditions. The relevant question is what a defendant can actually do with them under supervision. *Cf. Munchel*, 991 F.3d at 1283 (assessment of danger depends on "the resources and capabilities of the defendant"). Mr. Alfozan's earning power depends on staying here. He has already disclosed his accounts to Pretrial Services, and he agrees not to move money abroad or open new accounts without approval. And because the Consulate General has stated in writing that it is ready to cover the full bond, a financial condition will not "result[] in the pretrial detention of the person." § 3142(c)(2).

**5. Mr. Alfozan has every reason to stay and defend this case.**

Flight would cost Mr. Alfozan his permanent residence, his pending citizenship, his career, his home, and the community of friends who have written to this Court. Staying costs him the chance to answer a single non-violent charge with the assistance of counsel. He knows the charge, he has retained counsel, and he is asking to appear. The calculus the government imagines does not exist.

**D. A Rigorous Combination of Conditions Will Reasonably Assure His Appearance.**

Mr. Alfozan proposes the following conditions under § 3142(c)(1)(B), and he will accept any others the Court finds necessary:

1. **Supervision.** Report to Pretrial Services as directed and comply with all supervision requirements. § 3142(c)(1)(B)(vi).
2. **Location monitoring and home detention.** Wear a GPS ankle monitor and remain at his residence at all times except for court appearances, meetings with counsel, medical needs, religious services, and other activities approved in advance by Pretrial Services. § 3142(c)(1)(B)(iv), (vii), (xiv).
3. **Residence.** Reside at his family's home in Millbrae, California, or at another residence approved in advance by Pretrial Services, and not change residence without prior approval.
4. **Travel documents.** Surrender every passport and travel document he holds, from any country, to Pretrial Services within 24 hours of release, or confirm that it remains in the government's custody; and not apply for or obtain a passport or other travel document from any country while this case is pending. Mr. Alfozan's passport is currently held by federal agents, and he has not requested any travel document.
5. **Travel restrictions.** No international travel of any kind while this case is pending. Not leave the Northern District of California without prior Court approval, and not enter any airport, seaport, or international border crossing. Mr. Alfozan consents to Pretrial Services notifying U.S. Customs and Border Protection of these restrictions.
6. **Secured appearance bond.** Execute an appearance bond in the amount to be determined by the Court, co-signed by one or more personal sureties from his Bay Area community, and secured by cash or property posted by Mr. Alfozan or on his behalf. § 3142(c)(1)(B)(xi)–(xii). The Consulate General has stated in

writing that it is ready to cover the bond (Ex. K), so a financial condition will not result in detention. The defense nonetheless proposes personal sureties so that the people closest to Mr. Alfozan have their own obligations at stake.

7. **Consular undertaking.** The Consulate General of the Kingdom of Saudi Arabia has confirmed in writing to Pretrial Services that it will not issue any travel document to Mr. Alfozan during his release and that it will promptly notify Pretrial Services of any request for one. (Ex. J.) Mr. Alfozan will not request a passport or travel document from the Consulate General or any other government.

8. **Financial conditions.** Mr. Alfozan has already disclosed his checking and savings accounts, his stock and investment accounts, and all of his other financial resources to Pretrial Services. He will not transfer money or assets outside the United States, or open new financial accounts or lines of credit, without prior approval from Pretrial Services, and he will provide any further financial reporting Pretrial Services requires.

9. **No contact and stay-away.** Not contact any current or former OpenAI employee known to be a potential witness except through counsel, and stay away from all OpenAI premises. § 3142(c)(1)(B)(v).

10. **Devices.** Not possess any covert audio or video recording or surveillance device.

11. **Third-party custodian.** Release to the custody of a third-party custodian approved by Pretrial Services, who agrees to supervise Mr. Alfozan and to report any violation to Pretrial Services. § 3142(c)(1)(B)(i). Three people have offered to serve and have contacted Pretrial Services: Farhan Khan (San Francisco), Ali Abdalla (San Francisco), and Ismail Breiwish (Santa Clara).

12. **Standard conditions.** Commit no federal, state, or local crime and comply with all standard conditions of release. § 3142(c)(1)(A).

Location monitoring and third-party custody are "alternatives to detention," conditions that are "generally more intrusive" and suited to moderate- and higher-risk defendants. *Benchbook* § 1.03, at 37 & nn.18–19. Mr. Alfozan volunteers them anyway, together with the continued surrender of every travel document and a secured bond, so the Court need not take his intentions on faith. Each condition targets a specific part of the government's theory. The no-international-travel, travel-document, airport, border-notification, and consular conditions close off any route out of the country. GPS monitoring and home detention address movement. The financial conditions address means. The personal sureties put his community's resources, not only his own, behind his appearance. Taken together, these conditions do far more than "reasonably assure" his appearance. *Fortna*, 769 F.2d at 249.

**E. Detention Would Impose Serious and Unnecessary Harm.**

Detention for as little as three days "can disrupt employment and family life." *Benchbook* § 1.03, at 44 n.47 (citing Jefri Wood, Fed. Judicial Ctr., *The Bail Reform Act of 1984*, at 15–16 (4th ed. 2022)). It would also impair Mr. Alfozan's ability to help prepare his defense. The government's case appears to rest on technical evidence that is taken out of context (device firmware, encryption, internal software logs, and surveillance video), and Mr. Alfozan, a software engineer, is well placed to help counsel evaluate it. The Bail Reform Act does not require that cost when conditions are available that reasonably assure his appearance.

## V. CONCLUSION

The government has not proven, and cannot prove, that no condition or combination of conditions will reasonably assure Mr. Alfozan's appearance. He has lived in this country for fifteen years, holds permanent residence with citizenship pending, has returned from every trip abroad, and has the support of fifty-four people who know him. He bought the ticket the government relies on before any investigation existed, for a date set by immigration rules. The Court should deny the government's motion for detention and order Mr. Alfozan released on the conditions proposed above, including a complete bar on international travel, or on any additional conditions the Court finds necessary.

Dated: October 16, 2026

Respectfully submitted,

/s/ William V. Pernik

WILLIAM V. PERNIK

/s/ Nas Yasin

NAS YASIN

Attorneys for Defendant

ABDULRAHMAN ALFOZAN